Good morning, Your Honors, and may it please the Court. My name is Christopher Bose. I The Social Security regulations acknowledge that certain symptoms like chest pain and fatigue and pain are a very real phenomenon, but are sometimes very hard to detect and quantify. Nevertheless, when tethered to medically determinable impairment, the Commissioner has a set of regulations that direct its adjudicators to follow certain procedural and substantive rules in evaluating these symptoms, which may or may not be a symptom of a disease. Here, the Administrative Law Judge made an error, and perhaps early on in the COVID pandemic, there was confusion about what long COVID is. Ms. Ramos applied for benefits in 2021. The judge held the hearing in April of 2022. The judge, Ms. Ramos, presented the diagnosis of long COVID. So long COVID is when you've recovered from COVID, but now you have this constellation of symptoms that don't go away. In Ms. Ramos's case, and in other people's cases, it's tachycardia, or something called dysautonomia, where when you get up, your body thinks that you're running a marathon, so your heart rate goes up to 170. Despite the fact that you're just standing. Your body doesn't control the heart rate. She presented evidence before this judge that she had these types of problems. Brain fog, something called post-exertional malaise, meaning that after exercise, she's very tired. She testified and reported that she has to take a nap during the afternoon because she gets so tired during the day. All of these symptoms are very consistent with what's called the long COVID symptoms. As the administration itself acknowledged in something called an emergency message promulgated in April of 2021. Even if you're right that the ALJ did not diagnose the long COVID properly, the symptoms were what the focus of the conclusion were for the ability to do light work, weren't they? Yes, but when tethered to an actually medically determinable impairment, those symptoms take on collectively, but also individually. It's a phenomenon. It's not one thing in itself. It's not just shortness of breath and difficulty concentrating and forgetting how to do a kitchen recipe, which is one of the things that she complains of. It's all of these things together, and looked upon on their own, they might not be as significant as they would be together. I thought your argument was that the label was missing. I mean, it wasn't that the symptoms were not considered individually and together. It was that they were not put together under the heading of long COVID. I'm not sure why that matters if you're addressing the symptoms properly in the ability to work analysis. Well, we believe it does matter because, as I said, individually, like if I present a claim and I say, well, I have an ache in my leg, I have pain in my leg, and I feel tired during the day, those two things independently without being tethered to a medically determinable impairment, they're really nothing. They don't register in the analysis past step two of the sequential evaluation, which we believe is what happened here. And we don't believe that the judge, in fact, actually considered all of her problems, her brain fog and the need to, you know, take a restorative nap in the afternoon for an hour. She didn't take these things properly into consideration, despite the fact that at the hearing, she tells Ms. Ramos that she would look into it. She would consult Social Security and try to figure these things out. The resulting decision says nothing about that effort. The judge was really on her own. She didn't seek the guidance that she claimed she would have sought. She didn't seek any information from any available medical consultants that the Social Security Administration has for the asking. And she certainly didn't bother to ask any of Ms. Ramos' treating physicians about why they were prescribing the medications that they were prescribing. The propranolol to control the tachycardia that she was experiencing. She was seeing numerous different experts in a way to try to understand and control her symptoms. And this was not properly addressed in the administrative law judge's decision. The commissioner argues that we forfeited certain arguments. I don't believe that that's true. I think if we look at the Estrella case, Judge Wesley says that arguments, legal arguments need to be raised, but factual arguments don't have to be fleshed out necessarily. Ms. Ramos clearly said that the record wasn't properly developed. In the district court, she pointed to the fact that Ms. Ramos complained about difficulty with exercise and the judge didn't follow up and ask her, well, what are you talking about? What kind of problems are you having with exercise? In Estrella, our understanding is that it's enough to bring up the legal argument that the record's not fairly developed. And the argument here that the ALJ failed to reach out to treating sources and develop a medical source statement is part and parcel of the same argument of the failure to develop. And, of course, it's tied to our main argument is that the judge did request information from the doctors, right? And so you're saying that there's an additional obligation to follow up with everyone who doesn't respond? The next step is if the commissioner can't get that information from the treating source, they will then go to a consulting source, which didn't happen here either. But when the administration asks a consulting source to evaluate someone, they are required to provide a medical source statement. Well, it would be illogical to say that they're obligated to ask the consultative sources for a medical source statement, but not the treating physician in the first instance. I mean, if the treating source comes back and provides all of the medical source statement under the way the regulations work, presumably they don't have to go to the consultative source. Here, the problem was, I mean, the judge didn't ask, or the administration, too, didn't ask for any of the treating sources and didn't seek any consultative source medical opinion, whether it's an examining physician or a medical expert. It wouldn't have to be an examining source. What gaps in the record do you think would have been filled had that course been taken by the ALJ? post-exertional fatigue are some of the symptoms that people are complaining about. There's consistency to them. We should try to treat them. We should treat them in the context that it's a new phenomenon that deserves attention and should not be lightly disregarded, as what was done here. The judge is not a medical doctor. The judge is not equipped to understand all of these things together in such a new fashion. And we would ask that the appropriate action would be to send the case back for that analysis, which should have happened three years ago. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Molly Carter for the Commissioner of Social Security. Substantial evidence supports the ALJ's finding that Ms. Ramos could do a range of simple, light work, despite her impairments. Physically, the ALJ limited Ms. Ramos to light work, with occasional stooping and climbing of stairs. Mentally, the ALJ limited her to simple work, requiring little or no judgment, occasional decision-making, occasional changes, and occasional contact with the public and coworkers. Ms. Ramos has not shown that a reasonable fact-finder was required to assess greater functional limitations. Ms. Ramos often expressed uncertainty about whether she could return to her skilled job as a special education teacher, and the ALJ agreed, finding that she could not perform her past relevant work, but that she could do other unskilled work in the national economy. Although the ALJ did not articulate COVID or long COVID as impairments at Step 2, she instead identified the more specific impairments that resulted from or worsened after Ms. Ramos' presumptive COVID infection. She assessed, as severe impairments, status post-pulmonary embolism, asthma, tachycardia, which she's emphasized here today, pericarditis, and depression. And she also assessed a non-severe but still medically determinable cognitive impairment, which she considered at subsequent steps of the sequential evaluation. The ALJ thoroughly considered Ms. Ramos' allegations of symptoms and limitations, and she did not discount any limitation on the basis that Ms. Ramos lacked a diagnosis for a medically determinable impairment of COVID. The ALJ instead reasonably found that Ms. Ramos' allegations regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the record evidence. Based on the record as a whole, she found that Ms. Ramos could do a range of light, simple work, and substantial evidence supports both of those findings. First, the ALJ considered Ms. Ramos' treatment history and the effectiveness of treatment, and that treatment was largely conservative. It consisted mostly of medication, including medical marijuana, a beta blocker, a propranolol, and a blood thinner, and she actually declined to take offered antidepressants. She also received some physical therapy, some online cognitive rehab, and she engaged in extensive exercise, which was recommended. And that treatment was largely effective. Her pulmonary embolism and pericarditis resolved. Ms. Ramos reported that her anxiety improved with therapy, her sleep and her pain improved with medical marijuana, and her tachycardia was largely controlled with a beta blocker, with some adjustments on the timing of when she took it to regulate her heart rate while she was exercising. The ALJ also considered objective examination findings. Ms. Ramos' pulmonary and cardiovascular exams were largely unremarkable after summer of 2020. Physically, she showed consistently normal gait, and even when she was diagnosed with additional degeneration in her neck and her back, Dr. Thiv Kumar said that her MRI and her neurological evaluation were, quote, reassuring. Neuropsychological testing in January of 2022 showed some abnormalities, but consistent with the limitations of simple work. She showed fair memory and attention, normal comprehension and language functions, and the ability to answer questions and follow commands. Other mental status exams showed that while her mood fluctuated, she remained cooperative with full affect, normal thoughts, insight, and judgment, which is consistent with work requiring little or no judgment and only occasional changes, decision-making, and social interaction. Finally, Ms. Ramos engaged in extensive activities that required stamina and concentration consistent with light, simple work. She was a single parent to two young children with disabilities, and she represented several times that she was out of work to care for her younger son. She represented that she was solely responsible for the household chores, including laundry, cleaning, shopping, and cooking. She also reported additional caretaking related to her grandmother's medical difficulties. She also engaged in extensive exercise, variously reporting taking Zumba classes online, walking as many as five miles in one day, generally walking two to three miles per day, five to six days per week, strength training, and taking exercise classes at the gym. She was able to travel to Costa Rica for two weeks in the summer of 2021. So based on all this evidence as a whole, the ALJ reasonably found that Ms. Ramos could do a range of simple, light work. If Your Honors have no questions, we ask that you affirm. Thank you, Counsel. Thank you. We'll hear from her. Thank you, Your Honors. The Administrative Law Judge at Step 2 of the sequential evaluation discounted cognitive functioning as a non-severe impairment, so she didn't consider it. She didn't consider post-exertional malaise, which again is one of these well-recognized components of long COVID. She didn't recognize shortness of breath. In a meandering way, the judge looked at the case separately with all of these individual other symptoms, but that's different from looking at the case as a whole. It's kind of like dividing it up. In the Dixon case, this court ruled a long time ago that you can't separate out impairments and then say they're insignificant. You have to consider the combined effect of all impairments throughout the sequential evaluation. That's in the statute. That didn't happen here at Step 2. In Step 2, this was not considered. The other issue is that this issue with Zumba. This occurs, I think, once at transcript page 609 in February of 2021. Ms. Ramos reports to her therapist, her psychotherapist, that she's excited to start Zumba again, something that she had done before. But a month later, she's telling Dr. Polizzi and Dr. Fatikoff that she can't do it. It's wiped her out. And they're trying to tell her that what you need to do is you need to do walking. That's the exercise that you should do. You should not exceed it. They're telling her that she needs to engage in some exercise. This is presumably to prevent deconditioning because of her condition. And we see that in March and April, there's no more Zumba. There's one reference to Zumba. She is walking. She describes walking but complains that when she walks a certain distance, her heart rate goes up. Dr. Fatikoff says what you need to do is you need to do sub-strenuous exercise. You can't exercise once you start to have the symptom. And this is true of a treatment for people with long COVID. You can't exercise beyond what your tachycardia is doing because you will wipe yourself out. And that's what we see in this record. She's not doing gymnastics. She's not doing cardio. She's not doing Zumba. She wanted to get back to Zumba. It didn't happen. This is another example of how the judge got a lot of the facts wrong in the case and the commissioner as well. I appreciate your attention to this important case. Thank you, Your Honors. Thank you, counsel. Thank you both. We'll take the case under review.